UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

______________________________________

UNITED STATES OF AMERICA,

Plaintiff,

DOCKET NO. 1:19-cr-57

vs.

MICHAEL ALAN NUYEN,

Defendant.

_______________________________________/

TRANSCRIPT OF SENTENCING HEARING

BEFORE THE HONORABLE ROBERT J. JONKER, CHIEF JUDGE

GRAND RAPIDS, MICHIGAN

February 27, 2020

Court Reporter: Glenda Trexler
Official Court Reporter
United States District Court
685 Federal Building
110 Michigan Street, N.W.
Grand Rapids, Michigan 49503

Proceedings reported by stenotype, transcript produced by computer-aided transcription.

A P P E A R A N C E S:

FOR THE GOVERNMENT:

MS. ALEXIS M. SANFORD
UNITED STATES ATTORNEY'S OFFICE
330 Ionia Avenue, N.W.
P.O. Box 208
Grand Rapids, Michigan 49501-0208
Phone: (616) 456-2404
Email: Alexis.sanford@usdoj.gov

FOR THE DEFENDANT:

MR. PATRICK WILLIAM O'KEEFE, II
O'KEEFE LAW, PLLC
3893 Okemos Road, Suite B-1
Okemos, Michigan 48864
Phone: (517) 253-0114
Email: 5469132420@filings.docketbird.com

* * * * *

Grand Rapids, Michigan

February 27, 2020

3:01 p.m.

P R O C E E D I N G S

*THE COURT:* All right. We're here on the case of the United States against Michael Nuyen, 1:19-cr-57. It is the time set for sentencing.

Let's start with appearances, please.

*MS. SANFORD:* Good afternoon, Your Honor, Alexis Sanford appearing for the government. Present with me is Special Agent Ted Westra of the ATF.

*THE COURT:* All right. Thank you.

*MR. O'KEEFE:* Good afternoon, Your Honor,

Patrick O'Keefe on behalf of Michael Nuyen who is seated to my right.

*THE COURT:* All right. Thank you.

Let me start with a summary of what I've received. I have the presentence report from our probation officer. I also have a sentencing memorandum from each side. And on the defense side there's also a motion for variance that's addressed in the sentencing memo. There is a significant list, I won't list them all, of character reference letters that have been filed as well on behalf of Mr. Nuyen. And then we have the government's motion on the forfeiture. I think that's it.

Is there anything else I should have from the government in writing?

*MS. SANFORD:* No, Your Honor.

*THE COURT:* Or anything else from the defense in writing?

*MR. O'KEEFE:* No, Your Honor.

*THE COURT:* The next question I had is whether either side is planning any additional evidentiary submissions today either on the objections, the forfeiture, or anything else.

*MS. SANFORD:* The government does have some additional information to present to the Court regarding forfeiture for which it was going to call Agent Westra.

*THE COURT:* All right.

*MS. SANFORD:* Everything else I plan to address to

the Court in allocution.

*THE COURT:* All right. How about on your side, Mr. O'Keefe?

*MR. O'KEEFE:* Thank you, Your Honor. We don't have any additional evidence, just allocution.

*THE COURT:* All right. Let's go ahead with whatever additional submission you have, then, and we'll go from there, Ms. Sanford.

*MS. SANFORD:* Thank you, Your Honor.

The government calls Agent Westra.

*THE COURT:* All right.

THEODORE WESTRA

*(The oath was administered)*

*THE WITNESS:* Yes.

DIRECT EXAMINATION

*BY MS. SANFORD:*

*Q.* Agent Westra, you were present for the trial in this matter?

*A.* Yes, ma'am.

*Q.* And you are aware that some currency was seized from Mr. Nuyen's residence?

*A.* Yes.

*Q.* Do you recall about how much money that was?

*A.* Close to $3,000.

*Q.* All right. 3,600 sound about right?

*A.* Yes.
*Q.* Okay. And so I asked you to do some research into Mr. Nuyen's potential sources of income?
*A.* That's correct.
*Q.* Let's start with the last known employer that he had. Did you contact that person?
*A.* Yes, I did.
*Q.* Who was the last known employer?
*A.* It was a company on the southwest side of Kalamazoo.
*Q.* And what was it called? What kind of company was it?
*A.* It was a -- I can't remember if it was like a temp service, a job that he went to, but it was just like a construction-type company.
*Q.* Okay. And did you personally go to that employer?
*A.* Yes, I did.
*Q.* And had he worked there recently?
*A.* No.
*Q.* Did they review their employment records for Mr. Nuyen?
*A.* Yes, they did.
*Q.* And when had he ceased working there?
*A.* He stopped working there in June of 2016.
*Q.* All right. Were you aware of any other recent employment for Mr. Nuyen?
*A.* No.
*Q.* Did you also receive from my office a subpoena for state

tax returns for Mr. Nuyen?
*A.* Yes, I did.
*Q.* And did you serve that subpoena?
*A.* Yes, I did.
*Q.* And we were seeking any tax return information from 2009 through 2019?
*A.* That's correct.
*Q.* And did the state have any such records?
*A.* No.
*Q.* And in fact we received certified records to that effect?
*A.* That's correct.

*MR. O'KEEFE:* Your Honor, I don't have any objection to the admission of the proposed exhibit.

*THE COURT:* All right.

*MS. SANFORD:* I'm going to approach and show you what I've had marked as Exhibit 2 for purposes of sentencing.

*THE WITNESS:* Yes, ma'am.

*Q.* *(BY MS. SANFORD)* Have you seen that document before?
*A.* Yes.
*Q.* What is that?
*A.* This is the return, the document from the State of Michigan, the Department of Treasury.
*Q.* Thank you.

*MS. SANFORD:* I move for the admission of Government Exhibit 2.

*THE COURT:* All right. Is that the item you just looked at?

*MR. O'KEEFE:* Yes, it is, Your Honor.

*THE WITNESS:* And no objection to 2, and we'll receive it. Thank you.

*Q.* *(BY MS. SANFORD)* Were you able to ascertain any other potential source of income for Mr. Nuyen?

*A.* No.

*Q.* All right. Thank you. I have no further questions.

*THE COURT:* All right. Do you have any cross that you want to present, Mr. O'Keefe?

*MR. O'KEEFE:* Yes, Your Honor, briefly.

CROSS-EXAMINATION

*BY MR. O'KEEFE:*

*Q.* Agent Westra, Mr. Nuyen was charged with a state case around that time; isn't that correct? Around the time that he got arrested for this he had a state charge pending; isn't that true?

*A.* I believe so.

*Q.* All right. And you learned that from, I assume, Investigator Seiser from KVET?

*A.* Correct.

*Q.* And as far as the $3,600 that was seized from his home, that was not seized near any drugs, correct?

*A.* I don't -- I don't know. I know where it was taken, and I

remember what led up to the seizure of that gun. I don't recall if there were any drugs anywhere near it.

*Q.* There were drugs in the house but not next to where this money was located, correct?

*A.* Correct. The money had been moved to my knowledge.

*Q.* And Mr. Nuyen had borrowed that money from his mother and from his brother so that he could post bail or hire an attorney on the state case, correct?

*A.* I have no idea.

*Q.* Do you know if he had a conversation with Officer Seiser to that effect?

*A.* The little I know about that money was just where it was found and how officers located it.

*Q.* All right. So you did a -- you executed a subpoena on state tax returns?

*A.* That's correct.

*Q.* You did not execute a subpoena on federal tax returns?

*A.* No.

*Q.* You did not check with Mr. Nuyen's accountant or whether or not he had actually used H & R Block to prepare his taxes?

*A.* Absolutely not.

*Q.* Okay.

*MR. O'KEEFE:* Just a moment, Your Honor.

*THE COURT:* All right.

*MR. O'KEEFE:* I have nothing further.

*THE COURT:* All right. Any redirect?

*MS. SANFORD:* No. Thank you, Your Honor.

*THE COURT:* You may step down.

Any other evidence?

*MS. SANFORD:* Not for purposes of this.

*THE COURT:* Are you still satisfied with the evidentiary record?

*MR. O'KEEFE:* Yes, I am, Your Honor.

*THE COURT:* All right. Then we can go to the sentencing issues.

What I'm seeing -- of course, we don't have a plea agreement, so we don't have to deal with that. In the guidelines what I'm seeing is that the parties agree that based on the presentence report and the 101.9 grams of a hundred percent meth we'd be at level of offense 30. That's where the presentence officer stopped, and I believe that's where the defense thinks she properly stopped. And if I'm reading the government's position correctly, the government believes the officer should have included two additional kilos based on the Vogel proffer and converted the $3,600 into meth and added that, which would take you up into level 36.

Is that the only guideline issue from your perspective?

*MS. SANFORD:* Yes, Your Honor.

*THE COURT:* And from yours?

*MR. O'KEEFE:* Yes, Your Honor.

*THE COURT:* Okay. I just have one other question for the government. At least under the presentence report as I read it we have a criminal history category of III based on the scoring. There was a point in your brief, Ms. Sanford, where I thought you referenced category II.

*MS. SANFORD:* I apologize, Your Honor. The initial presentence report said category II.

*THE COURT:* All right.

*MS. SANFORD:* I was on vacation when the final presentence report came out, so I had already drafted this, and so when it was filed nobody corrected that. I apologize for that.

*THE COURT:* Well, I think some points were scored because there was a sentencing in the state court later.

*MS. SANFORD:* Correct.

*THE COURT:* Okay. And your position is category III as well, Mr. O'Keefe?

*MR. O'KEEFE:* That's correct, Your Honor. When we spoke to Officer Mosley, she had indicated that Mr. Nuyen had been sentenced on a state case --

*THE COURT:* Okay.

*MR. O'KEEFE:* -- before he was sentenced on this case, and I think Mr. Nuyen was a little confused about that. I don't think his attorney in that case advised that that could

potentially raise his guidelines in this case, but nonetheless we are in agreement that that conviction should be scored.

*THE COURT:* All right. Well, why don't we hear from Ms. Sanford since it's a government objection on guidelines, and then we'll get your position on the guidelines, Mr. O'Keefe, and then I'll either rule on it or maybe I'll just go to allocution for everybody first. But at least let's start with the guideline issue.

*MS. SANFORD:* Certainly, Your Honor. The government's position is that these other two items, the meth that Mr. Vogel discussed and the money if converted to meth, are attributable as relevant conduct.

The conduct that Mr. Vogel described the government believes is relevant because it's the same sort of conduct involving the same sort of drug sold in the same amounts, roughly ounce amounts, and it just preceded the offense conduct here. So Mr. Nuyen was arrested in February of 2019. Mr. Vogel describes conduct that occurred September of 2017 through December of 2018.

And so I think, as laid out in the memo, when we look at cases like, for instance, United States v. Nichols at 979 F.2d. 402, a drug purchase that preceded offense conduct by three months including the same conspirators and objective was relevant conduct. Or United States v. Miller at 910 F.2d. 1321, 20 months of cocaine sales could be considered

relevant conduct even if the defendant was only charged in a conspiracy spanning three of those months.

I think when we look at where he was selling drugs, the Kalamazoo area, the amounts that he was selling, the type of drug he was selling, it does seem to be relevant conduct to the same area where he was found with drugs, the types of drugs he was found with, and the amounts of drugs that he was found with.

Regarding the currency, the Court is aware that seized funds can be converted and the burden there is a preponderance of the evidence that the money is attributable to drug activity and what the conversion ratio is. Here we believe that the money is attributable to drug activity because we believe that that was Mr. Nuyen's only source of income at the time. He had the money hidden in his house. I'm not certain why if he had borrowed money from his mother for bond he would have then hidden it from her so she had to go hunt around for it as we heard on the jail calls.

And then this Court heard testimony at trial from Agent Tom Burns about the value of crystal methamphetamine in Kalamazoo at that time and that an ounce would be worth between 250 and 500 dollars, and, therefore, we think the math is that this would be an additional 200 to 400 grams of crystal methamphetamine attributable to Mr. Nuyen as relevant conduct.

Does the Court have questions?

*THE COURT:* No. Thank you.

*MS. SANFORD:* All right. Thank you.

*THE COURT:* Mr. O'Keefe.

*MR. O'KEEFE:* Thank you, Your Honor. With respect to the proffer that was conducted with Mr. Charles Vogel, to give the Court some background, Mr. Vogel is a childhood friend of my client's. And they even went so far as to call each other cousins even though they weren't related by blood. When Mr. Vogel was arrested he was Mirandized and he was transported to the jail, and he gave, I believe, at least some of the statement in the back seat of the police car. So my only issue with that is not necessarily the timing of it but the credibility of Mr. Vogel.

It's my understanding that he had cooperated with the government and that he had immediately started cooperating with local authorities. We don't -- we don't have any way to judge his credibility. And more importantly, if you look at the government's exhibit of his proffer, he acknowledged to the federal agent that he was someone who robbed drug dealers from time to time. And if he had a robbery conviction, if he were on the stand, I would think that would impact his credibility. So if Your Honor had heard from Mr. Vogel, if he had testified in this case, the Court would have had a much better picture of whether or not Mr. Vogel had a dog in this hunt, whether he had

an incentive to try to get himself a better deal by throwing Mr. Nuyen under the bus.

As the Court may be aware, essentially in this case the government is right now looking at a minimum of 15 years in prison. They are up by six touchdowns in the fourth quarter and they are still throwing the ball. Obviously the Court is aware that Mr. Nuyen's sentence should not be greater than what's necessary to accomplish the goals of sentencing. And so I would ask that the Court deny the government's motion. Or I should say correction to the sentencing guidelines. And I would also, candidly, state to the Court that I believe Officer Mosley conducted a very good, extensive presentence interview and that her analysis was spot on. So I'm going to ask that the Court take that into consideration as well and keep the level set at level 30. Thank you, Your Honor.

*THE COURT:* All right. Anything else from the government?

*MS. SANFORD:* No. Thank you, Your Honor.

*THE COURT:* All right. I'm going to go ahead and rule on the guideline issue now because regardless of what the Section 3553 factors may have to say, regardless of how mandatory minimums play, we all have to start with the guidelines and get them as correct as we can. And this is a pretty discrete decision and one I think I can rule on before we go any further. And the issue is also a significant one

because if the government is right, you would bump up to level of offense 36, and at criminal history category III that would be 210 to 262. No, sorry, 235 to 293. It would be 210 to 262 if he were at criminal history category II. And that's before the 60-month mandatory add-on. Right now at level 30 we are at 121 to 151 months before the mandatory 60 add. And the swing is significant.

When we're talking about the quantity determination, it would be the government's burden to prove that by a preponderance of the evidence, and I think in this case the government comes up short on the added quantities. And I want to explain why because this is the kind of thing that comes up often and in many cases I would find a basis to add the quantity, but here I think actually the first thing is that the parties have effectively agreed in scoring that last criminal history conviction, which was paragraph 74, possession of methamphetamine, and there was also a weapons possession, that that's not relevant conduct for purposes of the case. Because if it were relevant conduct, it wouldn't count as a prior sentence under Chapter 4 and you couldn't count it. And that's, I think, a charge and a conviction that more closely matches the timeline that was part of the proffer from Mr. Vogel than what we have here.

And the second point is that there is a specific time charged in this Indictment. It is a time that postdates the

time period that Mr. Vogel was talking about in his proffer. And when the government in its charging document specifically includes a conspiracy from a particular timeline, at least in a context like this, I'm going to be careful before expanding that.

A related point, I think, is that at least on the testimony at trial, I don't think Mr. Vogel figured so much as a coconspirator. At least that's not my memory. And the proffer, of course, was Vogel talking about himself and his unnamed confederates. So I think we're at best at equipoise and a little bit in the dark on who the other conspirators were related to the Vogel proffer, and that suggests to me that it would be tough to find by a preponderance that we're really dealing with the same conspiracy, albeit at a slightly earlier time.

And then I think the other thing that weighs on me and weighs against the addition here is that the added quantity, which would be significant if we added two kilos of pure meth, is resting entirely on one person's proffer. Somebody who I think has reason to have credibility questioned in addition to the prior convictions, in addition to the other admissions, just in terms of the overall context of what happened in the case. And certainly he was rewarded for that in his own way by the government in his sentencing. But there's reason to doubt the credibility. And we haven't seen

him. He's not here. I haven't been able to listen to him, to test his credibility, or to give Mr. O'Keefe a chance to test that. And although all by itself that might not prevent a preponderance finding if we had some other corroboration, we don't. At least from my perspective I see nothing else in the file that corroborates the Vogel proffer on this point. And that would mean I would be resting entirely a four-point swing on the credibility of somebody I've never met or heard from who has never testified to me under oath and never been cross-examined or subject to cross-examination, and I think that's a bridge too far. So for those reasons I would not credit the Vogel proffer.

The issue involving the conversion of the $3,600 is a closer call, I think, because certainly we would ordinarily be able to convert currency if I can find by a preponderance that it's likely drug proceeds. We'll undoubtedly talk about that when we get to the forfeiture issue more directly. But even assuming it is, I think the testimony from Special Agent Burns is a slender read as well to convert in this case. Because although there's a reasonable inference you could draw that Mr. Nuyen, if that was drug money, was selling crystal meth to earn it, we don't really know that for sure. There was also Xanax found in his room. It could have been other drugs. We don't know how long it was there. And we don't really have any basis other than the reality that the stuff that we did find

was crystal meth, we don't know whether it was crystal or whether it was diluted in some way below the 80 percent threshold for ice. And we do know there were some other substances, white substances found in the home that the officers thought might have been controlled substances but which tested negative. All of this is in paragraph 21. And that could have been cutting agent. So I think we just don't know enough to make that conversion credible in this case.

That alone would bump this, if it applied, only to 32, not to 36. But even assuming it's drug proceeds, which we'll make a finding on when we get to forfeiture, I wouldn't be prepared to convert that in this case into additional quantity of crystal meth. So for those reasons I'll overrule the government's objection on the quantity, stick with what the probation officer has in terms of level of offense 30, and the quantity determinations that it's based on criminal history category III, and that would mean that the guideline range is 121 to 151 months on the drug counts being 1 and 3 -- well, 1, 2, and 3, and 5 as well I guess for that matter, but there's a statutory max on that, and then plus 60 on Count 4 for the 924(c).

Are there other guideline issues the parties need to preserve or want to address?

*MS. SANFORD:* No. Thank you, Your Honor.

*MR. O'KEEFE:* No, Your Honor.

*THE COURT:* All right. So why don't we go to the other sentencing issues, then, including whatever the parties have by way of allocution, argument, or otherwise on what the sentence ought to be and on what the parties have briefed, if you want to address that further, and on the forfeiture. And I usually start with the defense on that, and I'll do that here too. So whenever you're ready, Mr. O'Keefe.

*MR. O'KEEFE:* Thank you, Your Honor.

Your Honor, if we start first with the defendant's request for sentencing under the sentencing guidelines range due to substantial assistance, I'll be candid this is the first type of motion that I've filed under this circumstance, but I would like to give the Court --

*THE COURT:* That's probably because they are almost always a loser because how in the world -- on this record how would you show that the government had anything by way of improper motive for not filing it? I mean, you have to make a substantial showing on that front, and just saying you didn't get it really isn't enough.

*MR. O'KEEFE:* Okay.

*THE COURT:* So you've got a significant hurdle.

*MR. O'KEEFE:* Sure. And I understand that, Your Honor, and really I'm just trying to make a record and do everything I can to help my client so . . .

*THE COURT:* Sure.

*MR. O'KEEFE:* You know, these proffers and sometimes these initial interviews at the time of arrests can get a little sticky, and it puts a lot of discretion in the hands of the government. And that's obviously the law. But my client has indicated to me that he gave information on multiple people at the time he was arrested. He's indicated -- I was with him at his proffer back in September before our trial. He gave additional information then. He's indicated he believes that that led to three people being indicted. But, again, Your Honor, you know, I'm not going to beat a dead horse on that front.

But I would like to talk about what sentence in my estimation is appropriate in this case. And as the Court has pointed out, Mr. Nuyen, if he's sentenced within his guidelines, is looking at at least 15 years in prison, and that would be for a hundred grams of methamphetamine. That's not to say that that's a small amount of drugs, but nonetheless, that is a very significant sentence. And as I said earlier, I think the Court is looking to impose a sentence that is going to accomplish the goals of sentencing and that being punishment and deterrence and reformation of the offender.

Mr. Nuyen, as I indicated in my sentencing memorandum and as I'm sure the Court is aware, and most of the time in cases like this we're dealing with an addict, and Mr. Nuyen was certainly an addict. And he got addicted to methamphetamine.

He started using along with his late girlfriend, his former codefendant, who had passed away about a month after she had been indicted. It's a sad case. As you can see, he had a lot of character letters. He has a lot of family in the courtroom. A lot of people who support him. And, frankly, a lot of people who have seen him in a much different light. And, unfortunately, they have had a front-row seat to see just how badly that addiction has taken control of his life.

They have indicated that he is a good son. He's a good brother. He's a good father. Mr. Nuyen cares very much about his family. And he knows that he's going to have to pay the consequences of these offenses. He can't deny it at this point in time. And it's just one of these cases where I just personally think 15 years is too much, but the law is the law, and we can't change the law. I understand that the Court has to follow the law when sentencing Mr. Nuyen. I would just ask that the Court sentence him to the minimum.

As to the forfeiture, Your Honor, you know, I would indicate that as the Court had pointed out in its earlier ruling, $3,600, that doesn't sound like it was apparently located right next to drugs or guns or anything nefarious. You know, could be $3,600 that is being collected by family members or perhaps being kept by Mr. Nuyen. There's people who keep cash in shoe boxes sometimes, so -- but there also was no indication that the government looked for Mr. Nuyen's federal

tax returns. And so, you know, we don't know if he filed federal tax returns versus state tax returns. We can't deny that the State of Michigan has no record of him filing those tax returns. But he has worked in the past. He has worked construction. And perhaps he doesn't have the records to show for it, but he's indicated to me that he has worked construction in the past. He does have some skills in that respect.

So, as I said, Your Honor, I would ask the Court to show mercy to Mr. Nuyen. Thank you.

*THE COURT:* All right. Thank you, Mr. O'Keefe.

You know, Mr. Nuyen, you, of course, have the privilege to speak. I did read your letter as well. But you don't have to say anything. And I'm sure you've already talked to your lawyer about it. Since you went to trial, since you'll undoubtedly be in an appeal position, it doesn't mean you're precluded from speaking, it just means you ought to use caution probably in what you say about the underlying facts of the case.

But this is a chance for allocution, just to talk to me about what's on your mind, about what you would like me to know about you or think about before imposing sentence. If you want to. It's not an obligation but an opportunity. And come to the podium with your lawyer if you want to do it.

*THE DEFENDANT:* I would just like to apologize to the

courts, to my family. I love them deeply. After 15 years clean, I never thought I would be sitting up here, all right? But I was a productive person in society. I actually ran crews and overseeing over a hundred million dollars in job production. I have over a dozen certifications. And I've trained over 200 people throughout the years. I've claimed my taxes. I don't know how they couldn't find them. I went to H & R Block.

What scares me the most is not being there for my kids, my family. But what also scares me is being institutionalized. And I'm ready to turn my life around, get it back on track. Any treatment, any programs you might be able to recommend, you know, without hesitation I'll do.

I was a productive person in society and I have a plan to be again.

*THE COURT:* Okay. I saw that. According to the presentence officer it looked like you were working some kind of construction job really more or less steadily from 2003 to 2016 or thereabouts. Does that sound about right?

*THE DEFENDANT:* Yes, sir.

*THE COURT:* Okay. All right. Anything else? I didn't mean to cut you off.

*THE DEFENDANT:* No, I'm just getting emotional.

*THE COURT:* Sure. Well, it's an emotional time, obviously. And that's fine. But we can wait for emotional

time to settle. And if you have other things you want to say, you know, you can get back up there or just speak right from where you're sitting if that's easier. Because, you know, the main thing I would want is when you leave today that you at least got to say what you came to say. And don't let a few tears get in the way of that.

*THE DEFENDANT:* Right. I appreciate that.

*THE COURT:* So if you need to settle, we'll wait. Do you feel like you're ready to say any more?

*THE DEFENDANT:* I just want to get my life back. That's all.

*THE COURT:* Okay.

*THE DEFENDANT:* I miss my family.

*THE COURT:* Okay. Thank you.

*THE DEFENDANT:* Thank you.

*THE COURT:* Mr. O'Keefe, is there anything else from your perspective at this point?

*MR. O'KEEFE:* No, Your Honor.

*THE COURT:* Then we'll go to the government and we'll hear from Ms. Sanford.

*MS. SANFORD:* Thank you, Your Honor. I do briefly want to address this issue of the defense request for a sentence reduction for substantial assistance. Because Mr. O'Keefe is right, the government does have a lot of power in this regard. And that's something that I take seriously.

And so when he indicated to me that his client believed that he had provided information that led to the indictments of three or four people, I wanted to follow up on that. And so I asked Mr. O'Keefe who those people were. And I just want to address that briefly with the Court.

The first is a gentleman named Nick Mann. Mr. Nuyen proffered in September of 2019. Nick Mann has been charged with a felon-in-possession offense that occurred in July of 2019, so that conduct predates his proffer. And I reviewed the reports actually in that particular instance. Mr. Mann had an outstanding felony arrest warrant on that day. A confidential informant provided information about his whereabouts. Police stopped him in a vehicle and arrested him with a gun and ammunition.

I contacted the agent on that case just to confirm that the person who provided the information about Mr. Mann's whereabouts was not Mr. Nuyen and it was not. So I don't believe that anything that Mr. Nuyen said led to that Indictment.

The other two people that he cited were a guy on Belmont Street in Kalamazoo and a guy named Eric and his significant other on Market Street in Kalamazoo. I asked office-wide if anyone was aware of either case and no one is. And so although Mr. Nuyen may have proffered about these people and they may be indicted, there isn't any indication that his

information led to their charges or to any specific investigation, and that's why the government believes that there's not substantial assistance here.

Regarding the forfeiture, I really don't have anything further beyond the proofs and some of the comments I made when we were talking about the conversion of money into drugs. We think that Mr. Nuyen didn't have employment at this time. From the phone calls it sounds like it was his money that was hidden in the home to which he directed his mother, and we think that this was money that was used to -- as either proceeds from drug sales or to further facilitate additional drug sales.

I know that the Court heard the trial in this matter, so I'm not going to belabor my allocution. I think the presentence report does a great job of laying out Mr. Nuyen's background. And he does have a lot of people in support of him and he did get a lot of letters in support, and I think it's a credit to him that so many people want to see him succeed and that they recognize addiction is a disease. But the problem is that Mr. Nuyen wasn't just an addict. He wasn't feeding only his own habit but those of others. And he combined that drug dealing with firearms. And the Court knows what a dangerous combination this can be. In fact, that's why we have some of these difficult guidelines that we have in cases like this. And I think for the protection of the community, for the

deterrence of Mr. Nuyen and others like him, and to reflect the seriousness of these offenses, a guideline sentence is appropriate in this matter. Thank you.

*THE COURT:* All right. Thank you.

Mr. O'Keefe, anything else?

*MR. O'KEEFE:* No, Your Honor.

*THE COURT:* All right. Well, I went through the guidelines earlier. We always start with the guidelines. Which with respect to all the counts other than the 924(c) are 121 to 151 months, and then the 924(c) is a mandatory plus 60, so we're effectively at 181 to 211 months combined from a guideline perspective. And then we have the floor at 10 years for the second count, Count 2, plus 60 on Count 4. So as a practical matter the statutory minimum for Mr. Nuyen is 180 months or 15 years in this case unless there's some pathway out of that. And the only one is potentially a release of the mandatory minimum on a substantial assistance motion. The only other one is safety valve which wouldn't apply here for a number of reasons.

The first place I want to start is with the defense motion on the 5K or the release of the mandatory minimum, which is really a separate question in and of itself. The government hasn't filed and has explained why both here today as well as in its written materials. And, of course, the natural and normal practice that all of us are familiar with in the federal

system is that the government controls the gateway to either a 5K reduction or in some cases even more than that. If the government decides that the mandatory minimum ought to be released as well, the government can make that additional request under 3553(e). Here the government hasn't made either. And that's normally the end of the matter.

The defense in this case suggests that the government made the wrong call, that it should have found substantial assistance, should have found a basis for not only a 5K but also a release of the mandatory minimum, and I just am not persuaded by the defense position on that. It's a very narrow pathway, I think, for any defendant who wants to make that claim, and I think both the briefing of the government and the defense recognize that. Basically there has to be a substantial showing that the government wasn't exercising its discretion in a proper way, that it was in fact using unconstitutional factors or some other improper motive, and the showing has to be substantial on the front end before the Court can really probe into that because otherwise you remove the discretion of the decision-maker, which is where the Sentencing Commission placed it for 5K and where the Congress placed it for 3553(e). And I don't see anything close to that on this record.

I think that the government here today has emphasized the particular individuals that Mr. Nuyen thought substantial

assistance might be credited for and made a good showing as to why from a government perspective there wouldn't be substantial assistance. The earlier written materials of the government demonstrate that there was certainly opportunity along the way, the government was willing to make offers it did to Mr. Nuyen that he had every right to reject and did reject, but I think that completely obviates any potential inference of impropriety on the part of the government in deciding that there was no substantial assistance or proper basis for the motion. So as a practical matter there's no pathway below the mandatory minimums in this case.

The only question then under Section 3553 is starting with the guidelines what's the proper sentence? Is it somewhere within the guideline range? Is it below the guideline range, which we would have about one month on, or is it above the guideline range? And I'm satisfied in this case that the appropriate sentence is at the mandatory minimum, which is basically a guideline sentence, one month short of that, which would be 120 months on Counts 1, 2, and 3, as well as 5, all concurrent, with the 60 months mandatory consecutive on Count 4 added onto that for a total of 180 months. That's a lot of time in my view by anybody's standard. I think it's especially a lot of time when you look at what Mr. Nuyen's history has been from the criminal history point of view and otherwise. He's actually got a lot of convictions, to tell you

the truth. You know, there really are a lot. And they are dating back from age 19 or so up through what we see here today. But there's a lot of nuisance convictions, which is what I would call them, as compared to a substantial history of serious felony convictions that carry significant time. This will, I think, if I read it right, be Mr. Nuyen's first time in prison. The CCW charge, the meth lab charge from '04, and then some later charges involving meth with one immediately preceding this that I mentioned earlier, that's about it. The rest are linked to potentially alcohol abuse or other things, but not a history of drug dealing in any substantial way. And so I think when we're talking about the first time that somebody finds themself on federal radar not only but also with crystal meth and a 924(c), 180 months is a big pop and sufficient in my mind to meet the punitive interests of any sentence. And I think more than that would be greater than necessary.

The other thing that strikes me -- and by the way, I did go back and look at the file of Mr. Vogel as well. It wasn't my case, but I was able to look at that in thinking about how much weight I would want to put on his proffer. And compared to Mr. Vogel, the criminal history here is considerably lighter. Mr. Vogel has a much more serious criminal history from my perspective. And I think that's worth comparing too, even though the sentencing he wound up with will

be about half of what Mr. Nuyen will wind up with.

The other thing that I do think is significant in Mr. Nuyen's case is that at least up until 2016 according to the presentence report he really did have pretty steady working history. You know, as with any construction job there are ups and downs, but the most recent one involving the roofing company in particular was a steady job for a number of years at a good wage. And I think that speaks well of what Mr. Nuyen is able to do when he's not in the grips of the drug addiction and when he's not in the grips of the dealing that went with it for him.

That's the next factor in my mind. There is certainly an addiction root to the trouble here. I think it's not maybe just meth, though meth is certainly part of it. Maybe other substances too. We see that in some of Mr. Nuyen's history. But whatever the substance is, addiction is certainly a part of the history and the story for Mr. Nuyen and something he needs to get a grip on. And when he does we hear from many people about the kind of person he can be in a constructive way in the family and the community. And we see that to some extent reflected in the things I've already talked about. The problem, though, from the government's perspective, from my perspective, is it's not just the addiction, it's the addiction that was the gateway to dealing significant quantities of a dangerous drug and a high-purity drug. And for purposes of

this case the government developed the investigation to whatever point it needed to support the charges, but there are certainly hints -- and we don't need to make any findings by a preponderance -- but there are certainly hints that significant dealing both preceded the charges in this case and there are still things that we heard about at the trial that we don't really know exactly what they mean. What was the concern about the drone, for example? And what, if any, role would that reveal beyond what we know from the purposes of the case?

The point being, whatever the ultimate root, Mr. Nuyen, unlike some other addicts, translated it into a business that's illegal, and sadly now he stands here in this court and has to pay a very big price for that, but I think a price at the mandatory minimum is sufficient to accomplish those purposes.

The Court will certainly recommend substance abuse assessment and treatment because that is one thing that Mr. Nuyen definitely needs. I'll recommend educational and vocational programming too that would be useful and appealing to Mr. Nuyen and his particular interests because he should do something constructive and try to gain whatever additional values he can while he's in the Bureau of Prisons for a lengthy period.

So in summary, again, on the custody side I intend 120 months concurrent on 1, 2, 3 and 5, plus the 60-month

mandatory consecutive on Count 4, for a total of 180 months.

The supervision also has some mandatory minimums for some of the charges. What I'm intending overall is five years which is the mandatory minimum that's in play here. Five years on Counts 1, 2, 3, and 4 concurrent and three years on Count 5 which is the limit. All of that concurrent. And during the supervision period I intend the normal mandatory conditions of cooperation in the collection of DNA and drug testing and the standard conditions including no firearms. Special conditions: (1) that Mr. Nuyen provide the probation officer with access to requested financial information; (2) that he not use or possess any controlled substance without a valid prescription. That includes marijuana, by the way, which I will list, because it's still a federal felony even though the state looks at it differently, and I don't want there to be any misunderstanding. Third, Mr. Nuyen must not use or possess any alcoholic beverages. Fourth, he needs to participate in a program of substance abuse assessment and treatment. And then fifth, he needs to submit to the search protocol of the probation officer that permits -- the Probation Office rather which permits search of person, property, papers, and effects on reasonable suspicion.

In terms of financial sanctions, there are five counts of conviction. The special assessment is $100 each. So that's a $500 special assessment that I intend.

For purposes of a fine, I don't see an ability to pay a fine within the guideline range, so I intend a below-guideline fine that is tied to Bureau of Prisons accountability at $250 per count, a total of $1,250 on the five counts, payable on the normal custodial terms which are $25 minimum quarterly installments or minimum monthly installments of $20 otherwise during the term of custody. Any balance due during supervision in minimum monthly installments of $50.

That leaves the forfeiture, and I think the parties are on the same page that the firearm and ammunition can be forfeited and is appropriately forfeited, but the parties disagree on the $3,600 that was seized from the home where Mr. Nuyen was staying. I think it was his mother's home. But it was the place that resulted in the search. And, of course, it's the government's burden here to prove a basis for forfeiture. It would have to be by a preponderance of the evidence that would make it more likely than not that the $3,600 is in fact proceeds of drug trafficking. And I think the government has made that burden on the forfeiture.

Aside from the tax return issues -- and sometimes, particularly if you're just looking at the state system, there might have been a basis on which H & R Block, for example, would have decided it didn't have to file something in the state depending on what was or was not withheld, but -- and if you have somebody who has been working steadily at established

businesses, and that's what the presentence report suggests, in all likelihood there was legitimate earnings for a time. It's possible Mr. Nuyen didn't file and wound up leaving money on the table as opposed to money he didn't pay or needed to pay rather. But by 2016 I think the testimony today, which is consistent with the presentence report, there's no further record of employment. And that's a number of years before we get into what happened here. And what we do know is that Mr. Nuyen was dealing drugs at least during some of that period, including the period that we're talking about in this case.

The other thing we know from the trial proceedings, and I think it was Exhibit 23B, one of the taped phone calls from the jail between Mr. Nuyen and his mother, he knew where the money was. It took him a while. He was thinking about different places it might be and his mom was moving around the house, first going upstairs and back downstairs, when they finally figured out it was in a speaker, and the call ends when his mom finds the money. And that's the money that's later recovered as described in the presentence report. And I think when you put the absence of any lawful -- at least apparent lawful means of income together with hiding something in a speaker in a house where there was also drugs and firearms on Mr. Nuyen's own person, it suggests to me that the most reasonable inference and certainly one by a preponderance is

that the money came from the sale of drugs of some kind. So I think the forfeiture is established by a preponderance, and I do intend to enter the government's preliminary order of forfeiture as provided for that reason.

So that's the overall intended sentence of the Court and the reasons for it. For the government, legal objections?

*MS. SANFORD:* I have no objections. I am presuming the Court does not intend to impose the condition in paragraph 146 about community service if there's not employment?

*THE COURT:* I don't. You know, my sense was that this is somebody who wants to be employed when he's not in the grips of addiction, and he demonstrated that, and so I don't see a need for that in this case.

*MS. SANFORD:* I just wanted to make sure it wasn't an oversight. I have no objections.

*THE COURT:* Thank you. I appreciate it. That's one of the reasons you're here. There are others as well.

Mr. O'Keefe.

*MR. O'KEEFE:* I don't have any objections, Your Honor, but I forgot to ask if the Court could recommend to the Bureau of Prisons that Mr. Nuyen be placed in a facility closest to home.

*THE COURT:* I don't have any objection to that. That's probably Milan.

*MR. O'KEEFE:* All right. Thank you, Your Honor.

*THE COURT:* Okay. All right. So I'm going to go ahead, then, and impose that as the sentence of the Court: A total custodial term of 180 months, which is 120 months on all the counts of conviction except for Count 4 and 60 additional months on Count 4 as required by statute. So a total of 180 months. The five years of supervision overall, only three on Count 5, all of them concurrent, on the terms indicated. The fine of $1,250. Forfeiture as requested by the government in the preliminary order, both the $3,600 and the firearms and ammunition. And then the special assessment of $500.

And that's what I'm imposing now as the sentence of the Court. I'm going to make it the written judgment of the Court too, and then you have a window of appeal, 14 days. So tell Mr. O'Keefe right away "I want to appeal," because obviously 14 days burns quickly.

Do you have any questions about that?

*THE DEFENDANT:* No, sir.

*THE COURT:* Okay. Mr. O'Keefe, anything else today?

*MR. O'KEEFE:* I just would add that Mr. Nuyen did ask me to file that Notice of Appeal, so we'll get that filed right away.

*THE COURT:* All right. Very good.

Anything else from the government?

*MS. SANFORD:* No. Thank you, Your Honor.

*THE COURT:* All right. Very good. Thank you.

*THE CLERK:* Court is adjourned.

*(Proceeding concluded at 3:55 p.m.)*

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

I further certify that the transcript fees and format comply with those prescribed by the court and the Judicial Conference of the United States.

Date: June 4, 2020

**/s/ Glenda Trexler**

Glenda Trexler, CSR-1436, RPR, CRR

EXAMINATION INDEX


| | PAGE |
|---|---|
| THEODORE WESTRA | |
| DIRECT EXAMINATION BY MS. SANFORD: | 4 |
| CROSS-EXAMINATION BY MR. O'KEEFE: | 7 |


* * * * *

EXHIBIT INDEX


| EXHIBIT | | OFFERED | ADMITTED |
|---|---|---|---|
| GVT 2 | State of Michigan document regarding subpoena request | 7 | 7 |